UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 17-10943-GAO

OOYALA, INC., and OOYALA MEXICO, S. DE R.L. DE C.V.,
Plaintiffs,

v.

RAUL FRANCISCO GARCIA DOMINGUEZ, DARIO PEREZ REAL, and BRIGHTCOVE, INC.,
Defendants.

OPINION AND ORDER
July 10, 2018

O'TOOLE, D.J.

The plaintiffs, Ooyala, Inc., and Ooyala Mexico, S. de R.L. de C.V. (collectively "Ooyala"), bring state and federal causes of action against the defendant, Brightcove, Inc. ("Brightcove"), and two of its now-former employees, alleging that Brightcove misappropriated Ooyala's trade secret business information and used that information improperly to solicit existing and prospective Ooyala customers.[1] Ooyala has moved for a preliminary injunction to enjoin Brightcove from communicating with customers whose information was stolen and from otherwise using, disclosing, or retaining that information.[2]

---

[1] The amended complaint includes claims for federal and state trade secret misappropriation, 18 U.S.C. § 1836; Mass. Gen. Laws ch. 93, § 42, unfair or deceptive trade practices, Mass. Gen. Laws ch. 93, § 11, and common law tortious interference.

[2] Though Ooyala originally sought an injunction based on all its legal claims, the parties have focused their arguments on the Massachusetts statutory claim for trade secret misappropriation. This Court will do the same.

**I.     Legal Standard**

In determining whether a party is entitled to a preliminary injunction, courts consider (1) the movant's likelihood of success on the merits of its claim; (2) the extent to which the movant will suffer irreparable harm if an injunction is not granted; (3) the balance of hardships as between the parties; and (4) the effect, if any, that an injunction (or the withholding of one) may have on the public interest. Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013) (citing Ross–Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996)). The first of these factors, the movant's likelihood of success, is the "touchstone" of the inquiry. Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) (citation omitted).

Ooyala, as the moving party, has the burden of providing a sufficient factual basis to justify a preliminary injunction. Nieves–Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). Because the parties have submitted adequate documentary evidence and the basic facts about underlying events are not in dispute, an evidentiary hearing is not necessary, and the Court may accept as true well-pleaded allegations in the complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction. Elrod v. Burns, 427 U.S. 347, 350 n. 1 (1976); Campbell Soup Co. v. Giles, 47 F.3d 467, 470–71 (1st Cir. 1995); Avaya, Inc. v. Ali, No. CIV.A. 12-10660-DJC, 2012 WL 2888474, at *1 (D. Mass. July 13, 2012).

**II.    Factual Background**

    A.    The Parties

Ooyala is a California-based technology company that markets cloud-based video platform services and products which allow its customers to curate, publish, monetize, measure and analyze

video content on a variety of electronic devices. Brightcove, a Massachusetts company, is the leading provider of such cloud-based video services and Ooyala's biggest competitor. Both companies do significant international business and compete for the same customer base, which generally consists of large media and/or broadcasting companies. Relevant to this case are the companies' respective business dealings in Latin America prior to 2017, when the alleged misappropriation at issue took place.

Internet use in Latin America is growing, with an estimated 375 million internet users and internet penetration that exceeds the global average by more than ten percent.[3] The typical sales cycle for these cloud-based services is longer in Latin America than in other regions, including the United States, averaging approximately nine months between first contact with a potential customer and final sale. This cycle entails a long process of meetings and client development in order to identify each client's business model, service needs, and key decision makers, which is then followed by client pitches, product demonstrations, and contract negotiations. The considerable expenditure of time and resources devoted to each sale makes customer-specific information particularly valuable to businesses in the region.

Ooyala derives more than half its business from international clients, including a now-significant customer base in Latin America. Over the past decade, Ooyala has expended substantial resources toward understanding the delivery methods, content preferences, and service needs of the regional markets, and has developed various genres of proprietary business information, including current and prospective customer lists and contact information, client-specific needs and pitches, sales/marketing plans and materials, and contract pricing methods, among others. Ooyala accordingly protects this proprietary information through confidentiality agreements, an updated

---

[3] Internet penetration measures the prevalence of internet use in a given population.

internal security policy, password-protected internet environments that are monitored by an information security team, two-fact authentication for email and shared document access, and annual third-party security audits. Access to this information is provided on a need-to-know basis.

Brightcove serves approximately four thousand customers in seventy countries. But there is no evidence in the record to suggest that Brightcove had a significant presence in Latin America prior to 2017, when it announced plans to expand into the region through the establishment of a new office in Mexico.

Raul Francisco Garcia Dominguez ("Garcia") and Dario Perez Real ("Perez") were employees of Ooyala's Latin America division, working out of its offices in Mexico, for several years before leaving Ooyala to join Brightcove as part of its Latin America expansion team.[4] Between October 2012 and April 2016, Garcia served as Ooyala's Regional Vice President for Latin America, and was responsible for growing, maintaining, and overseeing Ooyala's client relationships throughout the region. Perez, who reported directly to Garcia, served as the business development manager in Ooyala's Latin America division from November of 2014 until February of 2017. Because Garcia and Perez necessarily had access to Ooyala's confidential business information throughout their employment—indeed, it was their job to cultivate and develop this information—both were bound by Ooyala's confidentiality policies and agreements prohibiting the use or disclosure of such information during their employment and after their termination.

B.     The Alleged Misappropriation

Garcia left his position at Ooyala in April, 2016, and joined Brightcove the following November to serve as its General Manager for Latin America, a position comparable to the one he

---

[4] Garcia and Perez were originally named as defendants in this case, but have since been dismissed through Ooyala's filing of an amended complaint.

4

held at Ooyala. In this role, he was responsible for overseeing Brightcove's expansion into Latin America's markets, which Brightcove had not previously targeted, and for developing business and hiring a team to staff the new office in Mexico which Brightcove was planning to open as part of this expansion. On December 1, 2016, Perez, who was then employed at Ooyala, sent his resume to Garcia's Brightcove email address, initiating the communications that are central to the parties' present dispute. (Cummins Decl., Ex. D (dkt. no. 19-4).)

Between December 1, 2016 and February 23, 2017, Perez sent dozens of emails containing Ooyala's purportedly confidential business information to his personal email account and to Garcia's Brightcove email address.[5] In December, these emails included a collection of internal communications between Ooyala and various prospective customers, including a large company that was impatiently waiting for a proposal from Ooyala and beginning to look for an alternative servicer, (Cummins Decl., Exs. E & F (dkt. no. 36)), a company that was in the process of reviewing a proposal Ooyala had recently submitted (id., Ex. G), and a potential referral partner inquiring about a business opportunity, (id., Exs. I & J). In January, the emails included a contract between Ooyala and a current client that was marked "Confidential" and described services, prices, renewal dates, and fees, (id., Ex. K). In February, the emails included a "battlecard" document outlining Ooyala strategies for competing with Brightcove, (id., Ex. M); communications with a prospective customer and the eighty-one-page slide-deck presentation addressing that customer's specifications, (id., Ex. N); communications with a prospective customer concerning its video platform needs, (id., Ex. O); an email report to Garcia—in an email titled "Plan"—identifying eight current and prospective Ooyala customers with notes and contact information for their

---

[5] Copies of these emails were submitted to the Court under seal. They contain sensitive information and are only discussed to the extent necessary to resolve the present motion.

decision makers (id., Ex. P); and the link to a salesforce report showing the customer needs, pricing information, and client development status of three dozen current and prospective corporate customers, (id., Ex. U.).

Additionally, there was a February 16 email from Perez to his own personal email account titled "PRETOUR NAB," which contained a schedule for Ooyala's March, 2017 Latin America "roadshow." (Id., Ex. AA.) This roadshow was Ooyala's month-long sales tour during which it travelled to different countries throughout Latin America to meet with prospective customers. The schedule identified which companies Ooyala planned to meet with in each country, as well as the week in March these meetings where scheduled to occur.[6] This schedule included many of the companies whose key decision makers had been identified by Perez in prior emails, including the "Plan" email.

Subsequent emails between Garcia and Perez during the month of February show that they contacted several of the decision makers at these companies on behalf of Brightcove and attempted to arrange meetings in March before Ooyala was scheduled to do so.[7] (Id., Exs. DD–FF.) One such email shows that Garcia was arranging for top Brightcove executives, including two vice presidents, to be in attendance at one of these meetings. (Id., Ex. LL.) Ooyala discovered during the roadshow that several of the prospective customers it met with had already been approached by Brightcove, sometimes just days before, and representatives of one of these customers even noted how surprised they were by the similarity between the Ooyala and Brightcove slide decks.

---

[6] For example, the schedule showed that Ooyala was targeting five companies while in Country A during the week of March 7, followed by six different companies while in Country B during the week of March 14, and so on.

[7] This is one of the many instances where emails between Perez and Garcia included information or subject matters that Perez had previously only included in emails to his personal account. Accordingly, the Court is not persuaded by Brightcove's argument that emails sent to Perez's personal account were not subsequently passed on to Garcia.

Perez also was seeking employment at Brightcove throughout the time he was sending these emails. Towards the end of January, after sending Garcia a revised resume on December 21, Perez received an email from Carrie Walecka, a Brightcove recruiter, about joining Brightcove as part of Garcia's Latin America team. (Cummins Decl., Ex. H (dkt. no. 19-5); Ex. L (dkt. no. 19-6).) Perez eventually accepted an offer to join Brightcove and formally signed the Brightcove employment contract on February 21, while still employed at Ooyala. (Id., Ex. X (dkt. no. 19-8).)

Ooyala's standard practice when employees announce that they are leaving the company is to ask where they plan to work next. If the employee is planning to join a competitor, they are immediately escorted from the building in order to protect Ooyala's confidential information. On February 14, Perez informed Ooyala's regional sales director that he was leaving Ooyala to join Amazon Web Sales, and made the same representation to Ooyala's Regional Vice President, Patricio Cummins, two days later. Because Amazon Web Services was not a competitor, Perez was permitted to remain at Ooyala until he voluntarily resigned. However on February 23, after Cummins learned that Perez was in fact going to work for Brightcove, Perez was escorted from the building after turning over his devices and signing a termination and confidentiality agreement.

Shortly thereafter, Ooyala reviewed Perez's Ooyala-issued computer and discovered the above-described emails. On March 1, it sent a cease and desist letter to the attention of Brightcove's CEO, David Mendels, describing Perez and Garcia's alleged misconduct and requesting that Brightcove take corrective measures. Although this letter was sent by overnight delivery, there was no response from Brightcove until two weeks later, on March 15. David Plotkin, Brightcove's General Counsel, states in his affidavit that he believes Mendels was traveling during the beginning of March, and that it is his "understanding that the letter did not

7

come to Mr. Mendels' attention until about two weeks later," at which point it was also provided to Plotkin. (Plotkin Decl. ¶ 4 (dkt. no. 34).)

On March 15, Plotkin responded to the letter and informed Ooyala's counsel that he would be in contact after further investigation into Ooyala's claims. He also directed Garcia and Perez not to use or disseminate any information that might belong to Ooyala, and directed other employees to notify him if they received any such information. On March 28, Plotkin contacted Ooyala to schedule a follow-up conference call for March 31. During the March 31 call he advised Ooyala that he took the allegations seriously, but stated that he "was not seeing a factual basis for [Ooyala's] allegations" and "was having a difficult time because the emails were in Spanish." (Id. ¶ 7.) He assured Ooyala that Brightcove had no intention of using Ooyala's information and requested that Ooyala provide him with more information to support its allegations and aid his further investigation, but there were no further communications between the companies before Ooyala filed the present suit less than one month later.

Brightcove continued to employ Perez and Garcia after the March 31 conference call. On April 19, Brightcove issued a press release titled "Brightcove Grows Presence and Investment in Latin America" in which it quoted Garcia and described its plans to expand into Latin American markets and open a new office in Mexico. (Trach Decl., Ex. A, 3–4 (dkt. no. 22-1).) The release also described "key customer wins," and the addition of "local team members in Latin America to accelerate its growth in the region." (Id.) Mendels similarly told Brightcove investors during a May quarterly earnings call that its Latin America presence was off to a good start, and that they were pursuing a number of significant deals in the region. Ooyala also alleges that Brightcove flew Perez and Garcia to Boston for the annual customer sales conference on May 22–23. Brightcove admits that Perez attended but denies that Garcia did so.

8

Perez and Garcia were eventually terminated by Brightcove on July 25 and August 2, 2017, respectively. Brightcove maintains that none of the emails from Perez to Garcia containing Ooyala information were forwarded to any other employee of Brightcove.

Ooyala has alleged that as of May 31, 2017, it had lost one account to Brightcove, that it was forced to renew several contracts at lower prices, and that some prospective clients have stopped responding to Ooyala's communications. It claims that the proprietary information taken by Perez has enabled Brightcove to benefit from Ooyala's business development efforts, and poach its current and prospective customers without incurring the expense, time, and effort associated with the regions' nine-month sales cycle.

## III. Discussion

Ooyala claims that Garcia induced Perez to send him Ooyala's confidential information in exchange for prospective employment at Brightcove, and that the two men misappropriated this confidential information to Brightcove's benefit. It moves for a preliminary injunction ordering that Brightcove (1) not disclose or use any of Ooyala's confidential information, (2) return or cease to retain any and all such information, and (3) refrain from communicating with twenty-two current and prospective Ooyala customers whose information it contends was most blatantly stolen.[8]

### A. Likelihood of Success

To prevail on a claim for trade secret misappropriation under Massachusetts law, a plaintiff must show (1) the existence of a trade secret; (2) reasonable steps to preserve secrecy; and (3) the acquisition, through improper means, of a trade secret with intent to convert it for use by a party

---

[8] At an earlier conference, the Court directed the parties to attempt to narrow the scope of the injunction. Ooyala reduced the number of companies that it sought to enjoin Brightcove from contacting, which now stands at twenty-two, Brightcove maintains that no equitable relief is appropriate with respect to any of the companies referenced in the emails.

9

other than the rightful owner. Mass. Gen. Laws ch. 93, § 42; Incase Inc. v. Timex Corp., 488 F.3d 46, 52 n.10 (1st Cir. 2007); Advanced Micro Devices, Inc. v. Feldstein, No. CV 13-40007-TSH, 2013 WL 10944934, at *8 (D. Mass. May 15, 2013). Liability may extend to third parties not directly responsible for the misappropriation if they knowingly benefit from trade secrets that were obtained from a plaintiff in breach of a confidential relationship or through improper means. Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 238 (D. Mass. 2011) (quoting Data Gen. Corp. v. Grumman Sys. Support Corp., 795 F. Supp. 501, 507 (D. Mass. 1992)).

A trade secret "may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 260 N.E.2d 723, 729 (Mass. 1970); accord Burten v. Milton Bradley Co., 763 F.2d 461, 463 n.2 (1st Cir. 1985) (quoting J.T. Healy, 260 N.E.2d at 729). Of course, any such information must actually be a secret and not a matter of general public or industry knowledge. Advanced Micro Devices, 2013 WL 10944934, at *8, n.14 (citing J.T. Healy, 260 N.E.2d at 726). Customer or supplier lists and strategic business plans are among the types of business information that may be protected depending on their secrecy, the conduct of the parties, and the substantive nature of the information. Boston Sci. Corp. v. Lee, No. CIV.A. 13-13156-DJC, 2014 WL 1946687, at *4 (D. Mass. May 14, 2014); Advanced Micro Devices, 2013 WL 10944934, at *8; Optos, 777 F. Supp. 2d at 239. Courts consider six factors in determining whether such business information is protectable:

> (1) [T]he extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the

information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Jet Spray Cooler, Inc. v. Crampton, 282 N.E.2d 921, 925 (Mass. 1972) [hereinafter Jet Spray I].

### i.     *Existence of a Trade Secret*

Brightcove argues that the information here is simply not protectable as trade secret business information. Apparently taking aim at the fourth and sixth Jet Spray I factors, it claims that the emails sent by Perez contained merely "high-level references" to Ooyala's confidential information that were too vague to be of any use to a competitor, (Def.'s Suppl. Memo. in Opp'n to Pls.' Mot. for Prelim. Inj. 2 (dkt. no. 65)), and that the various customer lists with contact information for decision-making individuals included in these emails were not secret because the individuals had publicly accessible LinkedIn profiles listing their job titles and places of employment.[9]

This first argument plainly misdescribes the record, as the array of confidential information included in the emails submitted for review here—a full-term contract, an eighty-one page slide deck, a schedule of meetings with prospective clients, and internal communications discussing client needs, to name a few—could hardly be described as "high-level references." Such information would certainly provide any competitor with a meaningful business advantage by enabling it to pilfer business opportunities while avoiding business development costs. No serious argument can be made that Ooyala would have otherwise been willing to share this information freely with competitors.

---

[9] Brightcove submitted LinkedIn profiles of twenty individuals who were identified as contacts at one of the twenty-two companies for which Ooyala seeks an injunction. These profiles were submitted under seal and reviewed by the Court.

Brightcove's argument concerning the LinkedIn profiles is similarly unpersuasive. The profiles do not reveal the specific contact information for these individuals that was included in the Perez emails. Additionally, and more generally, the information that Ooyala claims to be a trade secret is not the job title or simple existence of an individual at a given company, but rather the identification of that particular individual, as opposed to other employees at a large media/broadcasting company, as a key decision maker in the ongoing business dealings. It is the time and effort exerted in developing this specific knowledge, as well as the corresponding competitive advantage, that is protected by trade secret law. See Bruno Int'l Ltd. v. Vicor Corp., No. CIV. A. 14-10037-DPW, 2015 WL 5447652, at *12 (D. Mass. Sept. 16, 2015); Optos, 777 F. Supp. 2d at 239; see also Jet Spray I, 282 N.E.2d at 840 ("'[I]t matters not, in such cases, whether the secrets be secrets of trade or secrets of title, or any other secrets of the party important to his interests.'" (quoting Peabody v. Norfolk, 98 Mass. 452, 459 (1868))).

The LinkedIn profiles here demonstrate Brightcove's unremarkable ability to locate an individual online whom it has already been made aware of. But knowing how to search for a certain someone is entirely different from knowing *whom* to search for. Brightcove does not present any credible evidence to suggest that it had knowledge of the particular significance of these individuals or their particular contact information prior to, or independent of, the information from Ooyala, nor that it could have acquired this information without significant time and expense in market research or client development.

> ii. *Reasonable Steps to Preserve Secrecy & Acquisition Through Improper Means*

Brightcove does not dispute that Ooyala took reasonable steps to preserve the secrecy of its information, and that this information was acquired by Perez and Garcia through improper means and in violation of various Ooyala policies and agreements concerning employee

confidentiality. The emails between Perez and Garcia also clearly establish that they not only intended to use this confidential information, but actually did so, thus satisfying the intent requirement of a trade secret claim. See Mass. Gen. Laws. ch. 93, § 42; Incase, 488 F.3d at 52 n.10.

### iii. Third Party Liability

Lastly, Brightcove argues that it did not encourage this misappropriation and, therefore, cannot be held responsible for the conduct of its employees, but that is precisely what Massachusetts trade secret law allows. See Whipps, Inc. v. Ross Valve Mfg. Co., No. CIV.A. 14-40045-TSH, 2014 WL 1874754, at *8 n.4 (D. Mass. May 8, 2014) (quoting Data Gen. Corp., 795 F. Supp. at 507); Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., 407 N.E.2d 319, 323–24 (Mass. 1980). To the extent that Brightcove disputes whether it knew or should have known of this misappropriation before March 15, the Court finds the evidence presented by Brightcove on this point to be more equivocal than credible. In any event, it is clear that Brightcove had reviewed the matters described in the cease and desist letter by at least March 28, when it scheduled the conference call for March 31. This review was sufficient for Brightcove to have notice of the misappropriation even if it disagreed with factual basis of the allegations; it chose not to take prompt action upon them. See Curtiss-Wright Corp., 407 N.E.2d at 323 (citations omitted) ("A defendant cannot insulate himself by 'studious ignorance of pertinent "warning" facts.'").

In sum, Ooyala's well-pleaded allegations, exhibits, and uncontroverted affidavits establish, for the purposes of preliminary relief, that the emails contained information that was secret, used in business, and provided the opportunity for a competitive advantage; that Ooyala took reasonable steps to preserve the secrecy of this information; and that the information was misappropriated and used by Perez and Garcia for the benefit of Brightcove, which was on notice

13

of these facts. Accordingly, the Court concludes that Ooyala is likely to succeed on the merits of its claim for trade secret misappropriation.

### B. Irreparable Harm

A threat of future harm is presumed when a plaintiff successfully demonstrates a likelihood of success on the merits of a claim for trade secret misappropriation. EchoMail, Inc. v. Am. Exp. Co., 378 F. Supp. 2d 1, 4 (D. Mass. 2005); see also TouchPoint Sols. Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 32 (D. Mass. 2004) (noting that this presumption "is in recognition of the fact that, once the trade secret is lost, it is gone forever"). The presumption is particularly applicable where, as here, the trade secrets are misappropriated by a direct competitor. See Advanced Micro Devices, 2013 WL 10944934, at *12; see also Boulanger v. Dunkin' Donuts Inc., 815 N.E.2d 572, 579 (Mass. 2004) ("Moreover, working for a competitor of the defendant makes it likely that the information the plaintiff possesses will be used, yet it might be impossible to detect or prove.").

Brightcove argues that there can be no likelihood of irreparable harm because Ooyala has failed to present evidence showing that Perez and Garcia successfully induced customer defections, or actually contacted all of the customers whose information was disclosed. But the limited case law that Brightcove cites for this proposition is decidedly distinguishable. Indeed, the Court is not aware of any case where liability or equitable relief in a trade secrets case was contingent on the misappropriator's ability to maximize the potential benefit from knowledge of another's trade secret information, which is the standard that Brightcove's argument here would effectively impose. See Iconics, Inc. v. Massaro, 266 F. Supp. 3d 449, 460 (D. Mass. 2017) ("If a misappropriator uses a trade secret even to some small benefit, but fails to implement it in a way that maximizes its value, it has still misappropriated the secret.").

### C. Balance of Equities

The balance of equities between the potential burdens on Ooyala as compared to those on Brightcove weighs toward granting Ooyala's request for preliminary relief. The potential harm to Ooyala from denying the injunction is significant, and Brightcove has not advanced any persuasive argument that it would be subject to any burden beyond that required to prevent the further use of Ooyala's confidential information.

### D. Public Interest

The issuance of a preliminary injunction is not appropriate unless there is a "fit (or lack of friction) between the injunction and the public interest." Nieves–Márquez, 353 F.3d at 120. Massachusetts clearly favors strong protection for trade secret information. See Jet Spray Cooler v. Crampton, 385 N.E.2d 1349, 1354–55 (Mass. 1979) ("The protection which we afford to trade secrets against one who wrongfully uses them is grounded on principles of public policy to which we have adhered since Peabody v. Norfolk, 98 Mass. 452, 457 (1868) . . . .").

## IV. Conclusion

For the reasons stated, Ooyala's motion for a preliminary injunction is GRANTED as follows:

1) Brightcove is enjoined from using or disclosing any of the Ooyala confidential information disclosed to Garcia and/or Brightcove by Perez;

2) Brightcove is ordered to return or cease to retain any and all information that originated or was derived from these emails, in whatever format it now exists;[10] and

---

[10] Compliance with this portion of the injunction requires more from Brightcove's than simply claiming that Garcia did not forward the emails from Perez to other employees.

3) Brightcove is ordered to refrain from communicating with any of the twenty-two companies identified by Ooyala, where the contact was based on information included in or derived from the emails from Perez pending further order of the Court.[11] The companies were identified and discussed in detail during oral arguments on this motion, (Mot. for Prelim. Inj. Hr'g Tr. (dkt. no. 60)), giving Brightcove actual notice of the scope of this injunction.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

---

[11] A list of the companies subject to this portion of the injunction is attached to this Opinion and Order as "Exhibit A," and filed under seal.